**ROBERT J. MCGAUGHEY, OSB #800787**
**HOLLY E. PETTIT, OSB #003506**
**LAW OFFICE OF ROBERT J. MCGAUGHEY**
805 SW Broadway, Suite 2440
Portland, Oregon 97205
Telephone:  503/223-7555
503/525-4833 (fax)
office@law7555.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| PLUMBERS LOCAL NO. 137 PENSION FUND and LABORERS' LOCAL #231 PENSION FUND, Derivatively on Behalf of UMPQUA HOLDINGS CORPORATION, | ) ) ) ) | Case No. 3:11-cv-00633-AC |
| Plaintiffs, | ) ) | PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| vs. | ) ) | Request for Oral Argument |
| RAYMOND P. DAVIS, et al., | ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| UMPQUA HOLDINGS CORPORATION, an Oregon corporation, | ) ) ) | |
| Nominal Party. | ) ) | |
| | ) | |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION AND OVERVIEW ........................................................................1

II.     FACTUAL BACKGROUND..................................................................................5

III.    ARGUMENT ........................................................................................................8

     A.      The Complaint's Allegations Sufficiently Demonstrate Demand Futility .............8

          1.      The Umpqua Board's Breach of Its Fiduciary Duty of Loyalty Strips It of Any Business Judgment Protection, Rendering Demand Futile ........................................................................................8

          2.      Pre-Suit Demand Is Unnecessary Because the Umpqua Board Is Not Disinterested ........................................................................14

     B.      Had Defendants Actually Read the Complaint, It Would Be Clear that Plaintiffs Do Not Allege Any Claim of Waste ......................................................18

     C.      The Complaint States Actionable Claims of Unjust Enrichment .........................20

IV.     CONCLUSION....................................................................................................23

# TABLE OF AUTHORITIES

Page

## CASES

*Acadia Brandywine Town Ctr., LLC v. Cresswell*,
No. 09C-08-166 PLA, 2010 WL 629842
(Del. Super. Feb. 17, 2010)................................................................................19

*Albino v. Albino*,
279 Or. 537, 568 P.2d 1344 (1977) .....................................................................21

*Aronson v. Lewis*,
473 A.2d 805 (Del. 1984) ..........................................................................2, 8, 15

*Beam v. Stewart*,
845 A.2d 1040 (Del. 2004) ...........................................................................16, 17

*Belova v. Sharp*,
No. CV 07-299-MO, 2008 U.S. Dist. LEXIS 19880
(D. Or. Mar. 13, 2008) ............................................................................ *passim*

*Blasius Indus., Inc. v. Atlas Corp.*,
564 A.2d 651 (Del. Ch. 1988)..............................................................................11

*Brehm v. Eisner*,
746 A.2d 244 (2000) ...........................................................................................14

*Brown v. Brewer*,
No. CV 06-3731-GHK, 2010 WL 2472182
(C.D. Cal. June 17, 2010) ...................................................................................13

*Carvalho v. Equifax Info. Servs., LLC*,
615 F.3d 1217 (9th Cir. 2010) ............................................................................23

*Chiles v. Robertson*,
94 Or. App. 604, 767 P.2d 903 (1989).................................................................9

*Colvin v. Colvin*,
No. 05-409-AA, 2007 U.S. Dist. LEXIS 57213
(D. Or. Aug. 1, 2007)..........................................................................................12

*Conrad v. Blank*,
940 A.2d 28 (Del. Ch. 2007)...............................................................................17

**Page**

*Crandon Capital Partners v. Shelk,*
219 Or. App. 16, 181 P.3d 773 (2008)..........................................................................*passim*

*Freedman v. Louisiana-Pacific Corp.,*
922 F. Supp. 377 (D. Or. 1996) ........................................................................................13

*Highland Legacy Ltd. v. Singer,*
No. Civ.A. 1566-N, 2006 WL 741939
(Del. Ch. Mar. 17, 2006) ..................................................................................................19

*IBS Fin. Corp. v. Seidman & Assocs., L.L.C.,*
136 F.3d 940 (3d Cir. 1998)........................................................................................11, 19

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
324 F. Supp. 2d 474 (S.D.N.Y. 2004).................................................................................4

*In re Columbia Entities Litig.,*
No. 04-11704-REK, 2005 U.S. Dist. LEXIS 33439
(D. Mass. Nov. 30, 2005)............................................................................................14, 15

*In re Immune Response Sec. Litig.,*
375 F. Supp. 2d 983 (S.D. Cal. 2005)...............................................................................19

*In re infoUSA, Inc. S'holders Litig.,*
953 A.2d 963 (Del. Ch. 2007)...........................................................................................17

*In re Maxim Integrated Prods.,*
574 F. Supp. 2d 1046 (N.D. Cal. 2008) ............................................................................17

*In re MRV Commc'ns, Inc.,*
No. CV 08-3800 GAF, 2010 U.S. Dist. LEXIS 46946
(C.D. Cal. May 10, 2010) .................................................................................................17

*In re Tyson Foods, Inc. Consol. S'holder Litig.,*
No. 1106-CC, 2007 Del. Ch. LEXIS 120
(Del. Ch. Aug. 15, 2007)......................................................................................8, 12, 13

*In re Walt Disney Co. Derivative Litig.,*
906 A.2d 27 (Del. 2006) ...............................................................................................2, 14

*In re Walt Disney Co. Derivative Litig.,*
907 A.2d 693 (Del. Ch. 2005), *aff'd,*
906 A.2d 27 (Del. 2006) ...................................................................................................14

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

**Page**

*In re Zoran Corp. Derivative Litig.*,
    511 F. Supp. 2d 986 (N.D. Cal. 2007) ...........................................................................17, 18

*Iwasaki v. Iwasaki Bros., Inc.*,
    58 Or. App. 543, 649 P.2d 598 (1982) ...........................................................................12, 21

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
    741 A.2d 377 (Del. Ch. 1999) .......................................................................................22

*Klinicki v. Lundgren*,
    298 Or. 662, 695 P.2d 906 (1985) .................................................................................9

*Levine v. Diamanthuset, Inc.*,
    950 F.2d 1478 (9th Cir. 1991) .......................................................................................3

*Lewis v. Hirsch*,
    No. CIV. A. 12,532, 1994 WL 263551
    (Del. Ch. June 1, 1994) ...................................................................................................16

*Mainiero v. Microbyx Corp.*,
    No. 14228-NC, 1996 Del. Ch. LEXIS 107
    (Del. Ch. Aug. 15, 1996) .................................................................................................5

*McPadden v. Sidhu*,
    964 A.2d 1262 (Del. Ch. 2008) .....................................................................................18

*Meinhard v. Salmon*,
    249 N.Y. 458, 164 N.E. 545 (1928) ..............................................................................9

*Noakes v. Schoenborn*,
    116 Or. App. 464, 841 P.2d 682 (1992) ........................................................................12

*Orman v. Cullman*,
    794 A.2d 5 (Del. Ch. 2002) ...........................................................................................14

*Pfeiffer v. Toll*,
    989 A.2d 683 (Del. Ch. 2010) .......................................................................................9

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ...........................................................................................13

*Ryan v. Gifford*,
    918 A.2d 341 (Del. Ch. 2007) ...............................................................................*passim*

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

Page

*Sommers v. Lewis*,
    No. CV 07-1142-MO, 2009 U.S. Dist. LEXIS 29776
    (D. Or. Apr. 8, 2009)................................................................................6

*State Const. Corp. v. Scoggins*,
    259 Or. 371, 485 P.2d 391 (1971) .........................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................5

*Tupper v. Roan*,
    349 Or. 211, 243 P.3d 50 (2010) ...........................................20, 21, 22

*Weiss v. Swanson*,
    948 A.2d 433 (Del. Ch. 2008)..........................................................13, 22

*Wilke v. City of Burns*,
    No. 04-929-MO, 2004 U.S. Dist. LEXIS 21468 (D. Or. Oct. 15, 2004), *aff'd*,
    No. 05-36111, 2006 U.S. App. LEXIS 30672 (9th Cir. Dec. 12, 2006)...................................5

*Winters v. Cnty. of Clatsop*,
    210 Or. App. 417, 150 P.3d 1104 (2007)................................................20

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78n-1(a)(1) ...............................................................................................1

Or. Rev. Stat. (2009)
    §60.047(2)(d)(A)......................................................................................17
    §60.261(2) ..................................................................................................8

Federal Rule of Civil Procedure
    Rule 15(a)................................................................................................23

## SECONDARY AUTHORITIES

S. Rpt. No. 111-176 (2010)................................................................................2

*The Corporate Director's Guidebook*,
    33 Bus. Law. 1591 (1978)...................................................................9

Plaintiffs Plumbers Local No. 137 Pension Fund and Laborers' Local #231 Pension Fund (collectively, "plaintiffs") submit this Memorandum of Law in Opposition to the Individual Defendants' Memorandum of Law in Support of Their Motion to Dismiss ("Motion" or "Defs.' Mot.") (Dkt. No. 22).[1]

## I.    INTRODUCTION AND OVERVIEW

The question at the center of this case is simple and straightforward. Does a shareholder vote matter? The answer – equally uncomplicated – is an unequivocal "yes."

On April 19, 2011, pursuant to the "say-on-pay" vote authorized by the recently enacted Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), over 61% of Umpqua's voting shareholders (many of whom are sophisticated institutional investors holdings tens of millions of shares of Umpqua stock) voted against the 2010 executive compensation packages approved by the Umpqua Board of Directors ("Umpqua Board" or "Board").[2] This resounding "no" reflects the belief by a majority of Umpqua's voting shareholders, after utilizing their own independent business judgment, that the 2010 Chief Executive Officer ("CEO") and top executive pay hikes *did not* serve their best interests as shareholder owners. Thus, the April 2011 shareholder vote is – from a factual perspective – compelling evidence that the Umpqua Board's decision to

---

[1]    Because Umpqua Holdings Corporation ("Umpqua" or the "Company") joins the Individual Defendants' Motion in full (Dkt. No. 25), all arguments made herein apply to both motions to dismiss.

[2]    Shareholders also demonstrated their distrust of the Umpqua Board by voting to have this "say-on-pay" vote every year – even though under Dodd-Frank, for a public corporation, the requirement is only once every three years – with a stunning 82% majority of voting Umpqua's shareholders. Declaration of Travis Downs III in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Downs Decl."), Ex. A; *see also* 15 U.S.C. §78n-1(a)(1).

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

grant 61% to 161% raises to top executives despite a -7.7% shareholder return, in addition to a 10%

decline in Umpqua's stock price, was not in the best interests of the Company or its shareholders.

Normally, a board of directors is protected by the "business judgment rule" when making

decisions about executive compensation.  The "business judgment rule" is a rebuttable presumption

that "'in making a business decision the directors of a corporation acted on an informed basis, in

good faith and in the honest belief that the action taken was in the best interests of the company.'"

*Crandon Capital Partners v. Shelk*, 219 Or. App. 16, 31, 181 P.3d 773, 783 (2008) (quoting *Aronson

v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).  But a plaintiff may rebut the "business judgment rule" by

presenting factual evidence that board members acted disloyally, *i.e.*, not in the best interests of the

company or its shareholders.  *Crandon*, 219 Or. App. at 31; *In re Walt Disney Co. Derivative Litig.*,

906 A.2d 27, 53 (Del. 2006).  Once rebutted, the burden shifts to defendants to demonstrate that the

excessive 2010 compensation was entirely fair.  *Crandon*, 219 Or. App. at 33; *Walt Disney*, 906

A.2d at 53.

The April 2011 shareholder vote – in which 61% of Umpqua shareholders (including 13 of

the Company's 20 largest investors)[3] rejected the Board's executive compensation increases – is

powerful evidence that the Umpqua Board did not act in the best interests of the Company's

shareholders because the pay raises contradicted Umpqua's representation that executive

compensation would be aligned with maximizing shareholder value.  Thus, whatever protection from

liability the business judgment rule could have offered the Umpqua Board prior to April 19, 2011,

evaporated once the results of the say-on-pay vote were revealed.  *See* Dodd-Frank, S. Rpt. No. 111-

176, at 231 (2010) ("shareowner votes on pay would serve as a direct referendum on the decisions of

---

[3]      *See* Downs Decl., Ex. D.

the compensation committee and would offer a more targeted way to signal shareowner discontent than withholding votes from committee members").

Although to date, the Umpqua Board has neither rescinded the excessive 2010 executive compensation nor publicly indicated any intention to do so, Umpqua recently announced that its 2010 executive compensation was not closely linked with maximizing shareholder value. As further evidence of the Board's breach of its fiduciary duty to the Umpqua shareholders, in a filing with the Securities and Exchange Commission ("SEC") on June 20, 2011, the Umpqua Board stated that the ratification of the 2010 executive compensation plan was an unreasonable departure from their own guidelines, stating:

> Effective June 17, 2011, with the full support of President and CEO Ray Davis and the Company's other executive officers, our Compensation Committee modified these RSA and option grants, as follows:
>
> - Adding performance vesting conditions linked to our total shareholder return, compared to the return of the KRXTR, a KBW regional bank stock total return index;
>
> - The awards will cliff vest after three years instead of time vest over a four year period, but only to the extent that the performance conditions are met; and
>
> - The modified grants will vest in whole or in part only if our total shareholder return achieves specified targets, subject to prorated vesting upon death, disability, qualifying retirement, termination for good reason or a change of control.

Downs Decl., Ex. B. These declarations against interest by party opponents and subsequent remedial measures further support plaintiffs' allegation that the Umpqua Board's 2010 pay hikes were not pay-for-performance but rather pay-for-underperformance.[4]

---

[4]    *See, e.g.*, *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1486 n.8 (9th Cir. 1991) (stating that an "admission against interest" can bolster allegations that defendants' statements were false and

Especially in light of this evidence, the issue of whether the 2010 CEO and other top executive compensation is in the best interest of Umpqua shareholders ***cannot*** be reasonably disputed. Thus, as a result of the Umpqua Board's decision to award massive executive pay raises, despite the utter failure to perform for Umpqua shareholders in 2010, plaintiffs brought this shareholder derivative suit on behalf of nominal party Umpqua, alleging: (1) breach of fiduciary duty by the Umpqua Board;[5] and (2) unjust enrichment by the Company's top executives.[6]

Defendants' only response is to claim that plaintiffs should have made a pre-suit demand upon the Board and, in any event, the shareholder vote is meaningless because it is non-binding. They are wrong. First, a pre-suit demand is not required where the entire Board faces a substantial likelihood of liability for acting disloyally to the Company and its shareholders by granting excessive executive compensation in 2010 that was not, under any definition, pay-for-performance. Plaintiffs' well-pled and particularized allegations detail just such a breach of fiduciary duty by defendants here.

Second, neither Oregon, Delaware nor the United States Congress mandate (let alone suggest) that a court wholly disregard the outcome of a shareholder vote as meaningless – even if the

---

misleading); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made.").

[5]    The individual director defendants are Raymond P. Davis ("Davis"), Allyn C. Ford, Peggy Y. Fowler, Stephen M. Gambee, Jose R. Hermocillo, William A. Lansing, Luis F. Machuca, Diane D. Miller, Hilliard C. Terry III, Bryan L. Timm and Frank R.J. Whittaker.

[6]    Davis (Umpqua's CEO), Bradley F. Copeland ("Copeland") (Umpqua's Chief Operating Officer or "COO"), Ronald L. Farnsworth ("Farnsworth") (Umpqua's Chief Financial Officer or "CFO") and Mark P. Wardlow ("Wardlow") (Umpqua's Executive Vice President and Senior Credit Officer) (collectively, "Executive Defendants").

vote is an advisory one.  *See Mainiero v. Microbyx Corp.*, No. 14228-NC, 1996 Del. Ch. LEXIS 107, at *7-*8 (Del. Ch. Aug. 15, 1996) ("Delaware Courts support the enfranchisement of Delaware's corporations' shareholders. ***The importance of allowing shareholders to vote at an annual meeting is critical to effective corporate governance***.").[7]  Nor did Dodd-Frank change the court's duty to accept as true all of the allegations contained in the complaint and draw all reasonable inferences in favor of the nonmoving party when assessing a motion to dismiss.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Wilke v. City of Burns*, No. 04-929-MO, 2004 U.S. Dist. LEXIS 21468, at *2 (D. Or. Oct. 15, 2004), *aff'd*, No. 05-36111, 2006 U.S. App. LEXIS 30672 (9th Cir. Dec. 12, 2006).  Thus, with the 2010 enactment of the Dodd-Frank's say-on-pay provision, courts are now much better positioned to evaluate, with indisputable evidence, if a corporation's board of directors acted in the best interests of the true owners of the company, the shareholders.  *Id.*  And, because the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty of Loyalty, Aiding and Abetting, Breach of Contract and Unjust Enrichment (the "Complaint") demonstrates that defendants did not do that here, their Motion should be denied.

## II.    FACTUAL BACKGROUND

The largely admitted and otherwise uncontestable underlying facts to the Complaint's allegations include the following:

1.     Umpqua is an Oregon corporation and therefore its internal affairs, including whether the Umpqua Board acted in the best interests of shareholders when increasing CEO and top

---

[7]     All emphasis is added and all citations are omitted unless otherwise noted.

executive pay in 2010, despite the fact that in 2010 Umpqua's stock price declined by nearly 10% and its shareholders endured a negative 7.7% annual return, are governed by Oregon law;[8]

2.    The Umpqua Board voluntarily adopted pay-for-performance for its executive compensation philosophy, and represented to Umpqua shareholders that its executive compensation system is designed to link executive pay with corporate performance by rewarding executives for superior performance and having consequences for underperformance;

3.    Umpqua's shareholder base consists primarily of sophisticated institutional investors, such as BlackRock Inc., the California Public Employees' Retirement System and Atlanta Capital Management Company, LLC, that not only own millions of Umpqua's shares worth tens of millions of dollars, but who combined, oversee and manage almost $4 trillion in assets. *See* Downs Decl., Ex. C. These types of sophisticated institutional investors clearly have the experience and resources to independently evaluate whether executive compensation is in their best interests as shareholder-owners of Umpqua;

4.    Umpqua's institutional shareholders have financial interests in Umpqua that typically are significantly larger than the individual and/or collective financial interests of the Umpqua Board and/or its corporate managers;[9]

_____

[8]    To the extent Oregon law is undeveloped in an area of shareholder derivative litigation, courts often turn to Delaware common law. *Sommers v. Lewis*, No. CV 07-1142-MO, 2009 U.S. Dist. LEXIS 29776, at *8 (D. Or. Apr. 8, 2009).

[9]    *See id.*; *see also* Downs Decl., Ex. D (*Wall Street Journal* article noting that Umpqua's institutional investors held approximately 70% of the voting shares).

5.      In connection with Umpqua's "say-on-pay" advisory vote, the Umpqua Board unanimously recommended shareholder approval of the 2010 executive compensation in the Proxy Statement filed with the SEC on February 25, 2011;

6.      In connection with Umpqua's 2010 executive compensation plan, defendant Davis, (Umpqua's CEO and a member of Umpqua's Board) would receive an approximate $1.4 million or 60% increase in compensation over 2009;

7.      In connection with Umpqua's 2010 executive compensation plan, defendant Copeland (Umpqua's COO) would receive an approximate $795,000 or 112% increase in compensation over 2009;

8.      In connection with Umpqua's 2010 executive compensation plan, defendant Farnsworth (Umpqua's CFO) would receive an approximate $514,000 or 140% increase in compensation over 2009;

9.      In connection with Umpqua's 2010 executive compensation plan, defendant Wardlow (Umpqua's Senior Credit Officer) would receive an approximate $553,000 or 161% increase in compensation over 2009;

10.      In connection with Umpqua's say-on-pay advisory vote, the Umpqua Board set forth all of the material factors that it considered and led it to conclude that increasing CEO and top executive pay in 2010 was consistent with Umpqua's pay-for-performance executive compensation policy and, most importantly, in the best interests of Umpqua shareholders;

11.      On April 19, 2011, Umpqua conducted its annual shareholder meeting in Portland, Oregon, and during that meeting shareholders voted upon the Umpqua Board's 2010 executive compensation in the Company's first-ever "say-on-pay" advisory vote;

12.    On April 22, 2011, Umpqua reported the final results of the say-on-pay advisory vote in a SEC Form 8-K ("8-K"), reporting that 54.5 million shares votes against the Umpqua Board's 2010 executive compensation proposal, or approximately 62% of Umpqua shareholders; and

13.    Since the adverse Umpqua say-on-pay vote, the Umpqua Board has not publicly reported in a filing with the SEC that the 2010 executive compensation has been or will be rescinded or otherwise modified.

## III.    ARGUMENT

### A.    The Complaint's Allegations Sufficiently Demonstrate Demand Futility

#### 1.    The Umpqua Board's Breach of Its Fiduciary Duty of Loyalty Strips It of Any Business Judgment Protection, Rendering Demand Futile

Under Oregon law, "[a] complaint in a proceeding brought in the right of a corporation must allege with particularity the demand made, if any, to obtain action by the board of directors and either that the demand was refused or ignored or why a demand was not made." Or. Rev. Stat. §60.261(2) (2009).  However, a pre-suit demand is unnecessary when there is reason to doubt that the challenged decision is the product of a valid exercise of business judgment. *Crandon*, 181 P.3d at 783; *cf. Aronson*, 473 A.2d at 815 (same).  It is also axiomatic that to remain eligible for protection under the business judgment rule, directors must faithfully discharge their unremitting duty of loyalty by always putting the interests of shareholders ahead of their personal interests and the interests of corporate managers. *See In re Tyson Foods, Inc. Consol. S'holder Litig.*, No. 1106-CC, 2007 Del. Ch. LEXIS 120, at *10-*11 (Del. Ch. Aug. 15, 2007) ("Loyalty.  Good faith. Independence.  Candor.  These are words pregnant with obligation.  The Supreme Court did not adorn them with half-hearted adjectives.  Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic

candor.").[10]  Paraphrasing the words of Judge Benjamin Cardozo, the court in *Chiles v. Robertson*,

94 Or. App. 604, 767 P.2d 903 (1989), wrote:

> "Many forms of conduct permissible in a workaday world for those acting at
> arm's length, are forbidden to those bound by fiduciary ties.  A [fiduciary] is held to
> something stricter than the morals of the market place.  Not honesty alone, but the
> punctilio of an honor the most sensitive, is then the standard of behavior. . . .
> Uncompromising rigidity has been the attitude of courts of equity when petitioned to
> undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular
> exceptions . . . .  Only thus has the level of conduct for fiduciaries been kept at a
> level higher than that trodden by the crowd."

*Id.* at 619-20 (citing *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928)).

Therefore, directors choosing to govern a corporation's affairs counter to the shareholders'

best interests – guided instead by the desire to serve themselves and that of corporate management –

cannot seek refuge from their fiduciary breach in the business judgment rule's protections.[11]  In fact,

*Crandon*, the very case defendants rely upon throughout their Motion, refused to afford the business

judgment rule presumption to directors who adopted defensive measures to entrench themselves at

the expense of shareholders.  219 Or. App. at 35; Defs.' Mot. at 8-9, 16.

Defendants ignore the results of the shareholder vote here and instead wrongly claim that

there can be no breach of loyalty simply because plaintiffs believe the "Umpqua executives did not

---

[10]    *See also Klinicki v. Lundgren*, 298 Or. 662, 666 n.2, 695 P.2d 906, 910 n.2 (1985) ("'By
assuming his office, the corporate director commits allegiance to the enterprise and acknowledges
that the best interests of the corporation and its shareholders must prevail over any individual interest
of his own.'") (quoting *The Corporate Director's Guidebook*, 33 Bus. Law. 1591, 1599-1600
(1978)).

[11]    *See also Pfeiffer v. Toll*, 989 A.2d 683, 707 (Del. Ch. 2010) ("**The duty of loyalty has
paramount importance under Delaware law**.  Delaware's consistent corporate philosophy has been
to grant deference to boards in exercising their authority to direct and oversee the business and
affairs of the corporation, balanced by **assiduous protection of the stockholders' right
to . . . meaningful enforcement of fiduciary duties, with particular emphasis on the duty of
loyalty**.").

deserve the compensation that the Board awarded them for 2010." Defs.' Mot. at 13.  In fact, it was

the vast majority of Umpqua shareholders – over 61% – who believed the executive compensation

was not in their best interests because it was grossly misaligned from the interests of the Company

and its shareholder-owners.  Of course, this should not surprise defendants because Umpqua's utter

failure to perform cannot reasonably justify increases in executive compensation as high as 161%.

*See* ¶36 (Umpqua shareholders suffered through a 10% drop in Umpqua's share price and a negative

7.7% shareholder return).[12]

Importantly, the 61% of voting Umpqua shareholders was not just some random amalgam of

stockholders with "axes to grind" against the Umpqua Board and the Company's top executives.  In

fact, it was just the opposite.  Sophisticated institutional investors like those who voted against

Umpqua's excessive 2010 compensation, owning tens of millions of Umpqua shares and managing

more than three trillion in assets combined,[13] are well versed in the intricacies of corporate

governance and making decisions in the best interests of their shareholders, pensioners and

employees.  Indeed, defendants acknowledged this fact when, prior to the April 2011 shareholder

vote, "Umpqua approached a few dozen institutional investors holding 70% of the company's stock"

only to find that 13 of the 20 biggest shareholders planned to vote against the outrageous

compensation increases proposed by the Umpqua Board.  *See* Downs Decl., Ex. D.

Thus, defendants' false implications that the Complaint's allegations merely represent the

opinions of two dissatisfied stockholders are patently false.  Defs.' Mot. at 14, 18-19.  By rejecting

---

[12]     All paragraph references ("¶__" or "¶¶__") herein are to the Complaint.

[13]     For a list of Umpqua's institutional investors as of both December 31, 2010 and March 31, 2011, *see* the 13F Historical Momentum Report printed from Thomson Research, attached as Ex. C to the Downs Decl.

the Board's 2010 executive compensation proposal, the "no" vote by the majority of Umpqua

shareholders reflects the Board's inability to act in the best interests of shareholders (the Company's

true owners). *See IBS Fin. Corp. v. Seidman & Assocs., L.L.C.*, 136 F.3d 940, 949 (3d Cir. 1998)

("'[The shareholder franchise] is critical to the theory that legitimates the exercise of power by some

(directors and officers) over vast aggregations of property that they do not own.'") (quoting *Blasius*

*Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659 (Del. Ch. 1988)).

Perhaps even more telling, defendants have not claimed that the April 19, 2011 vote meant

nothing.  How could they – especially when not two months after 61% of their shareholders voted

against the executive compensation package, defendants announced in a June 2011 8-K that "in

keeping with our stated and ongoing commitment to take shareholder input seriously, our

Compensation Committee has taken action to more closely link executive compensation to stock

price and dividend performance." Downs Decl., Ex. B.  But defendants cannot have it both ways; if

the vote means enough to cause the Umpqua Board to enact remedial measures to "link executive

compensation to stock price and dividend performance"; it also means that the vote reflects

shareholders' collective belief that the Board's decision to grant the excessive 2010 compensation

was not in the Company's or shareholders' best interests because the 2010 compensation was not

linked to performance.  *Id.*

Furthermore, the advisory nature of say-on-pay provision under the Dodd-Frank Act is

irrelevant because the vote itself, and the statements made within the Company's June 2011 8-K

(attached as Ex. B to the Downs Decl.), constitute evidence that the decision by the Umpqua Board

to reward the Company's CEO and other top executives for a performance that reaped no value for

shareholders in 2010 (*e.g.*, 10% decline in stock price and -7.7% annual shareholder return) was not

in the best interests of the Company or its stockholders.  The vote also rebuts any presumption of

business judgment rule protection for the Board and shifts the burden to defendants to demonstrate that their actions were in the shareholders' best interests. *Crandon*, 219 Or. App. at 31. Moreover, the results of the shareholder vote reflect the well-settled principle that directors do not have *carte blanche* to make executive compensation decisions that are not in the best interests of shareholders. *See Tyson*, 2007 Del. Ch. LEXIS 120, at *10-*11; *see also Colvin v. Colvin*, No. 05-409-AA, 2007 U.S. Dist. LEXIS 57213, at *30 (D. Or. Aug. 1, 2007) ("actions taken for own interests rather than that of corporation, 'absent a legitimate business purpose,' constitute a breach of fiduciary duty") (quoting *Noakes v. Schoenborn*, 116 Or. App. 464, 472, 841 P.2d 682, 687 (1992)).[14]

Finally, plaintiffs' allegations do not rely on *post-hoc* justifications for the unreasonable executive pay. Had defendants tailored their Motion to address the Complaint's actual allegations, they would realize that plaintiffs simply allege that the Umpqua Board ignored and contradicted its own representations to shareholders (*i.e.*, that compensation would be based on performance and designed to maximize shareholder value) when they approved the exorbitant pay raises that enriched Umpqua executives despite failing performance. ¶¶3, 32. Thus, while plaintiffs are not so naive to expect that defendants write out a full *mea culpa*, these shareholders do expect (like shareholders of any company do) that when directors voluntarily choose to speak, they do so mindful of their duty to

---

[14]    Defendants rely on *Iwasaki v. Iwasaki Bros., Inc.*, 58 Or. App. 543, 548, 649 P.2d 598, 601-02 (1982), for the proposition that "Oregon law recognize[s] that if the 'allegedly excessive salary seems more a product of business judgment than an attempt to siphon off profits,' stockholders cannot recover on a claim for supposedly improper compensation payments." Defs.' Mot. at 13. However, in *Iwasaki*, plaintiffs there offered ***no*** evidence that the salary was excessive, either "'on a comparative basis, considering salaries paid to others in the same business for similar work, or on any other objective basis.'" *Iwasaki*, 58 Or. App. at 548. In contrast to *Iwasaki*, the 2010 compensation of Umpqua's top level executives here increased on average over 115% year-over-year; astoundingly at a time when the Company, by the most objective measures of shareholder value, exhibited poor performance. ¶33.

speak the complete, full and unvarnished truth. *See, e.g.*, *Freedman v. Louisiana-Pacific Corp.*, 922 F. Supp. 377, 387 (D. Or. 1996) ("'a duty to speak the full truth arises when a defendant undertakes a duty to say anything'") (quoting *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994)); *Weiss v. Swanson*, 948 A.2d 433, 455-56 (Del. Ch. 2008).[15]  As Chancellor Chandler articulated in *Tyson*:

> For obvious reasons, a company may wish to be less than entirely detailed about trade secrets or other confidential information. Executive compensation, however, is not a realm in which less than forthright disclosure somehow provides a company with an advantage with respect to competitors. ***Sophism and guile on this subject does not serve shareholder interests.  When directors speak out about their own compensation, or that of company managers, shareholders have a right to the full, unvarnished truth***.

2007 Del. Ch. LEXIS 120, at *13-*14 n.18.

Taken as true, these particularized facts rebut the presumption that the Umpqua Board acted in the shareholders' best interests when it approved the 2010 executive compensation.  The facts alleged in the Complaint also sufficiently demonstrate that: (1) the Umpqua Board breached its duty of loyalty by ignoring shareholders' best interests and increasing 2010 executive pay in violation of the terms of its pay-for-performance executive compensation policy; (2) defendants face significant likelihood of liability for such breach; and (3) therefore, defendants are not entitled to the business judgment presumption at the pleading stage.  *Weiss*, 948 A.2d at 441 (denying motion to dismiss where the plaintiff rebutted the presumption that the directors' executive compensation, *i.e.*, stock option grants, was a valid business judgment).  Accordingly, defendants' arguments should be

---

[15]     As another example of defendants' reliance on inapposite case law, in *Brown v. Brewer*,  No. CV 06-3731-GHK, 2010 WL 2472182 (C.D. Cal. June 17, 2010) (*see* Defs.' Mot. at 22), the case had already proceeded to summary judgment and, as a result, both parties had the benefit of discovery which, as defendants are well aware, plaintiffs here do not.  Furthermore, conspicuously omitted from defendants' citation to *Brown* is that the court there actually upheld several claims by plaintiffs that defendants breached various fiduciary duties. *See Brown*, 2010 WL 2472182, at *12-*19.

summarily rejected and their Motion denied. *Cf. Orman v. Cullman*, 794 A.2d 5, 15 (Del. Ch. 2002) (denying motion to dismiss because questions regarding alleged fiduciary breach could not be resolved on the pleadings); *Belova v. Sharp*, No. CV 07-299-MO, 2008 U.S. Dist. LEXIS 19880, at *13 (D. Or. Mar. 13, 2008) (refusing to weigh evidence at pleading stage).[16]

### 2. Pre-Suit Demand Is Unnecessary Because the Umpqua Board Is Not Disinterested

The court in *Crandon* held that a pre-suit demand on a company's board of directors is unnecessary when a shareholder plaintiff can sufficiently allege that there is a reason to doubt that a majority of the board of directors is disinterested. *Crandon*, 219 Or. App. at 30. Thus, as courts applying both Oregon and Delaware law recognize, when a majority of a board's directors face a substantial likelihood of liability for breaching their fiduciary duty of loyalty, their independence is doubtful. *See, e.g.*, *In re Columbia Entities Litig.*, No. 04-11704-REK, 2005 U.S. Dist. LEXIS 33439, at *22-*23 (D. Mass. Nov. 30, 2005) (stating that "Oregon courts have found that demand is futile if 'the facts alleged show that the defendants charged with the wrongdoing, or some of them, constitute a majority of the directors or managing body at the time of commencing the suit . . . .'");

---

[16]    *Brehm v. Eisner*, 746 A.2d 244 (2000), relied upon heavily by defendants throughout their brief (Defs.' Mot. at 9, 12, 17, 22), actually supports plaintiffs' argument. As an initial matter, the executive compensation at issue in *Brehm* was never rejected by a majority of shareholders and, in fact, was never even subject to a shareholder vote. Even without the probative value of a shareholder vote, plaintiffs' claims survived dismissal and proceeded to summary judgment, and eventually to trial. Importantly, in *Walt Disney*, the court presciently noted that the result might be different for a similar present-day pay package approved in "an era that has included the Enron and Worldcom debacles, and the resulting legislative focus on corporate governance." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 697 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). Indeed, Chancellor Chandler's prediction has been borne out by the enactment of the Dodd-Frank Act in the face of the 2008 financial crisis.

*see also Belova*, 2008 U.S. Dist. LEXIS 19880, at *28-*31 (finding demand futility met under Delaware law).

Here, as demonstrated *infra*, the entire Umpqua Board is *prima facie* liable for a breach of loyalty by approving excessive executive compensation for Umpqua's CEO and top executives in violation of the express terms of the Board's executive compensation pay-for-performance policy. *See Columbia*, 2005 U.S. Dist. LEXIS 33439, at *22-*23; *Belova*, 2008 U.S. Dist. LEXIS 19880, at *28-*31. The decision by the Delaware Chancery Court in *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007), is instructive. In *Ryan*, the board of directors approved executive compensation in violation of the terms of its stated executive compensation policy and simultaneously made false representations to shareholders regarding the compensation. Rejecting the directors' arguments regarding demand futility, the court concluded that because the directors granted the executive stock options on terms inconsistent with the company's executive stock option program (similar to the Umpqua Board's deviation from its own policy to link executive compensation to maximizing shareholder value), the *Ryan* board breached its fiduciary duty of loyalty. *Id.* at 355-56. The *Ryan* court also found the directors' misconduct so egregious that it stripped them of the protections afforded by the business judgment rule. *Id.* Specifically, the court stated:

> A director who approves the backdating of options faces at the very least a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholder-approved plan, no less) and yet satisfy his duty of loyalty. Backdating options qualifies as one of those "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists."

*Id*.[17]

_____

[17]    Interestingly, in *Lewis*, a case cited to by defendants (*see* Defs.' Mot. at 17), the court there may have said that "executive compensation is a matter ordinarily left to the business judgment of a

Regarding defendants' mistaken claim that the Complaint only challenges the actions of one Board member (Defs.' Mot. at 11), had they read it more closely, they would have noticed that it actually alleges that every member of the Umpqua Board was in breach of his/her fiduciary duty of loyalty. ¶¶15-24, 26-29. Thus, all Umpqua directors face liability for approval of the pay increases and are unfit to consider pre-suit demand. Defendants' misplaced reliance on *Beam v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004), does nothing to bolster their position. There, the court dismissed claims of directors' interestedness based primarily on their close personal friendship with the interested director. Rather than making any claims grounded in interpersonal relationships, the Complaint here alleges every member of the Umpqua Board to be interested because, as in *Lynch* and *Ryan*, each directly engaged in incriminating conduct, *i.e.*, deciding to approve this excessive 2010 executive compensation despite an utter lack of performance. Even the court in *Beam* expressly found two of the directors interested: (1) the first based on her relation to the underlying claims (she was the subject of suit); and (2) the second because her position as an officer and inside director and the substantial compensation she received from the company raised a reasonable doubt about her ability to objectively consider pre-suit demand. *Id.*

Additionally, Umpqua's CEO, defendant Davis, is no ordinary interested director. Defendant Davis is the recipient of much of the excessive compensation that is the subject of this lawsuit. ¶¶11, 34. Defendant Davis's receipt of the excessive compensation at issue here renders him interested in the outcome of the litigation and raises a reasonable doubt about his ability to objectively consider a

---

company's board of directors," but is also noted that in that case "*[s]ignificantly, the stock option plans at issue and all the amendments made to those plans were approved by the Corporation's shareholders*." *Lewis v. Hirsch*, No. CIV. A. 12,532, 1994 WL 263551, at *3-*4 (Del. Ch. June 1, 1994). Thus, even defendants' own authority acknowledges the important evidentiary value of the results of a shareholder vote.

pre-suit demand.  *Beam*, 845 A.2d at 1044; *Ryan*, 918 A.2d at 356 ("Plaintiff alleges that three members of a board approved backdated options, ***and another board member accepted them. These are sufficient allegations to raise a reason to doubt the disinterestedness of the current board and to suggest that they are incapable of impartially considering demand***.").[18]  Moreover, as the Company's CEO, he holds substantial influence over the rest of the directors sufficient to raise a reasonable doubt as to their independence.  *See In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 984 (Del. Ch. 2007) (excusing demand on nine member board where complaint alleged board allowed CEO and major shareholder to enrich selves at the expense of the other shareholders).

Nor can Umpqua's defendant directors hide from liability under a blanket of "exculpatory language" contained in Umpqua's Restated Articles of Incorporation ("Articles").  *See* Defs.' Mot. at 15-16.  As the District of Oregon recently noted, a claim of exculpatory provisions may only operate as an affirmative defense and cannot serve to dispose of a matter at the pleading stage.  *Belova*, 2008 U.S. Dist. LEXIS 19880, at *23-*24.  In any event, even defendants admit that Umpqua's Articles do not exculpate for breaches of loyalty, acts or omissions not in good faith, intentional misconduct, or transactions from which the director derived an improper personal benefit.  Defs.' Mot. at 15; Or. Rev. Stat. §60.047(2)(d)(A) (stating that directors cannot be insulated through a corporation's articles from personal liability for breaches of the duty of loyalty).  Here, the Complaint alleges that

---

[18]     *Cf. In re MRV Commc'ns, Inc.*, No. CV 08-3800 GAF, 2010 U.S. Dist. LEXIS 46946, at *13 (C.D. Cal. May 10, 2010) ("A number of cases have held that the acceptance of backdated options creates reasonable doubt to the disinterestedness of particular directors."); *Conrad v. Blank*, 940 A.2d 28, 38 (Del. Ch. 2007) ("the two directors who allegedly received backdated options . . . are clearly not disinterested"); *In re Maxim Integrated Prods.*, 574 F. Supp. 2d 1046, 1060 (N.D. Cal. 2008) (allegations that specific directors sitting on the Board received backdated options were sufficient to create a reasonable doubt as to the disinterestedness of these directors); *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1003 (N.D. Cal. 2007) (same).

the defendant directors agreed to and participated in "a deliberate course of action designed to divert corporate assets in breach of [the] fiduciary duty of loyalty owed to Umpqua." ¶57. It further details that defendants committed acts of bad faith, in addition to knowing, willful and intentional misconduct for the purposes of favoring the interests of Umpqua's CEO and top executives at the expense of both the Company and shareholders. ¶59. Thus, the "liability raincoat" provisions of Umpqua's Articles provide no quarter for defendants' disloyal acts regarding Umpqua's excessive 2010 compensation. *See McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) (holding that a breach of loyalty is outside a corporation's exculpatory charter provision); *Zoran*, 511 F. Supp. 2d at 1017 (rejecting defendants' §102(b)(7) affirmative defense: "If the facts that plaintiff has pled are taken as true, the exculpatory provision will give individual defendants no quarter.").

Therefore, because the entire membership of the Umpqua Board faces a substantial likelihood of personal liability based on its decision to award undeserved executive compensation increases despite the Company's poor financial performance in 2010, the Complaint sufficiently alleges demand futility.

### B. Had Defendants Actually Read the Complaint, It Would Be Clear that Plaintiffs Do Not Allege Any Claim of Waste

Bereft of any potent response to plaintiffs' compelling evidence that demand upon the Board would have been futile because the entire Umpqua Board breached its duty of loyalty and is not entitled to the business judgment presumption, defendants desperately assert that the Complaint fails to adequately allege a claim of waste. Defs.' Mot. at 23. There is only one problem: plaintiffs do not assert a waste claim against defendants. The fact that defendants resort to such a blatant attempt to divert the Court's attention from the actual issues involved in this litigation only further highlights the strength of the Complaint's allegations.

Plaintiffs' claims are simple:  61% of Umpqua's voting shareholders used their own business judgment as sophisticated institutional investors to determine that the Company's 2010 compensation increases to Umpqua's CEO and top executives were excessive and did not comply with the Board's purported pay-for-performance policies.  Thus, according to 61% of voting Umpqua shareholders, these pay raises were not in the best interests of either Umpqua or its stockholder-owners.  *See IBS*, 136 F.3d at 949 ("'[The shareholder franchise] is critical to the theory that legitimates the exercise of power by some (directors and officers) over vast aggregations of property that they do not own.'").  Despite defendants' red-herring argument, plaintiffs do not ask this Court to make improper factual determinations of whether the increases in compensation were in fact justified.  *See, e.g.*, *Belova*, 2008 U.S. Dist. LEXIS 19880, at *13 ("***For purposes of the Motions to Dismiss***, I need not consider how return analysis may or may not refute backdating – that is, ***I will not weigh the evidence*** or lack thereof."); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 995 (S.D. Cal. 2005) ("'Court[s] should not . . . generate an evidentiary record and then weigh evidence . . . to dismiss [a] complaint.'").  Instead, plaintiffs argue that the facts, taken as true, provide compelling evidence demonstrating that defendants breached their duty of loyalty by acting in a manner inconsistent with the best interests of Umpqua's shareholders – stripping them of any protection under the business judgment rule and, therefore, rendering futile any pre-suit demand on the Board.  *Crandon*, 219 Or. App. at 30-35.[19]

---

[19]    With no claim for waste to respond to, defendants' reliance on *Highland Legacy Ltd. v. Singer*, No. Civ.A. 1566-N, 2006 WL 741939 (Del. Ch. Mar. 17, 2006), and related authorities serves no purpose but to improperly distract the Court's attention from the well-pled and particularized allegations supporting plaintiffs' breach of fiduciary duty claims here.  *See Acadia Brandywine Town Ctr., LLC v. Cresswell*, No. 09C-08-166 PLA, 2010 WL 629842, at *2 (Del. Super. Feb. 17, 2010) (proclaiming that a motion which misstates the record does "nothing to move this litigation toward resolution and has been wasteful of the Court's and counsel's time").

C.       **The Complaint States Actionable Claims of Unjust Enrichment**

Contrary to defendants' arguments here, the Complaint also adequately alleges unjust

enrichment against defendants Davis, Copeland, Farnsworth, and Wardlow.  Oregon courts define

"unjust enrichment" broadly so as to include situations involving "the acquisition or retention of

property in a way that is in some sense wrongful or . . . 'unconscientious.'" *Tupper v. Roan*, 349 Or.

211, 220, 243 P.3d 50, 57 (2010).  To state a claim for unjust enrichment, plaintiffs must allege: (1)

that a property or property interest that belongs to them was taken or obtained by someone else under

circumstances that were in some sense wrongful or inequitable; (2) that the person who possesses the

property is not the *bona fide* purchaser for value and without notice; and (3) clear evidence that the

property in the hands of the defendant rightfully belongs to them.  *Id.* at 223.[20]  As the Oregon

Supreme Court explained in *State Const. Corp. v. Scoggins*:

> "One is said to be unjustly enriched when he has received that which '*ex
> aequo et bono*,' 'in equity and good conscience,' 'upon principles of natural justice,'
> etc., he ought not to retain.' . . .
>
> To the jurist unjust enrichment is not a moral or ethical notion, but a legal one
> with an economic justification. The protection of property and its enjoyment is a
> primary obligation of every civilized state."

259 Or. 371, 390, 485 P.2d 391, 399 (1971).

Ironically, defendants themselves bootstrap the contention that the payment of excessive

compensation did not unjustly enrich Umpqua's CEO and top executives because such behavior did

---

[20]      Defendants cite this and another formulation for unjust enrichment by the court in *Winters v. Cnty. of Clatsop*, 210 Or. App. 417, 150 P.3d 1104 (2007), namely that plaintiffs must allege that (1) they conferred a benefit on defendants; (2) defendants were aware that they had received a benefit; and (3) under the circumstances it would be unjust for defendants to retain the benefit without paying for it.  Defs.' Mot. at 24-25.  While Oregon courts provide various tests for unjust enrichment, all condition restitution on alleging an inequitable taking like the excessive compensation alleged in the Complaint here.  *See Tupper*, 349 Or. at 222-23.

not constitute any fiduciary breach.  Defs.' Mot. at 24.  Thus, defendants' arguments regarding allegations of unjust enrichment must fail for the same reasons their other specious arguments do. *Belova*, 2008 U.S. Dist. LEXIS 19880, at *25-*26 ("Because this argument [for dismissing an unjust enrichment claim] relies on me dismissing the other claims, it fails.").  Oregon courts long hold that the breach of fiduciary duty may constitute a "wrongful circumstance" *ipso facto* for the purposes of alleging unjust enrichment.  *See Tupper*, 349 Or. at 223; *Albino v. Albino*, 279 Or. 537, 550, 568 P.2d 1344, 1351 (1977) (holding that a constructive trust arises wherever a fiduciary acquires or retains property in violation of a duty impressed upon him by that relation, even in the absence of fraud).

Additionally, simply because the Executive Defendants claim that they "performed services for the company" (Defs.' Mot. at 24) does not qualify them as "bona fide recipients" of unjustified compensation and require the dismissal of plaintiffs' unjust enrichment claim.  Where compensation results from the breach of a fiduciary duty, an executive cannot use the mere fact of her employment to justify an otherwise wrongful taking from the company; to hold otherwise would defeat the equitable principles underlying a claim for unjust enrichment, and courts have not hesitated to allow an unjust enrichment claim against employees that have provided substantial services to their employer.  *See, e.g.*, *Belova*, 2008 U.S. Dist. LEXIS 19880, at *25-*26 (refusing to dismiss unjust enrichment claim against company employees who engaged in options backdating).[21]

---

[21]    Defendants concede that the third element necessary to allege an unjust enrichment claim, namely that the payment, if shown to be wrongfully appropriated, rightfully belongs to the corporation.  Moreover, defendants' reliance on *Iwasaki* (Defs.' Mot. at 25), a case not involving an unjust enrichment claim, is both factually and legally inapposite.

Here, plaintiffs properly plead unjust enrichment by alleging that, as a result of the Umpqua Board's approval of the excessive 2010 executive compensation plan, Umpqua's CEO and top executives unjustly received excessive compensation at the expense of the Company and its shareholders alike. ¶¶68-69. Umpqua suffered a loss by paying out undeserved executive compensation packages to executives whose stewardship resulted in a 10% decline in the stock price and an annual shareholder return of negligible 7.7%. Thus, the Board's decision to award such compensation constituted a breach of fiduciary duty, thereby eliminating any protection they otherwise would have had under the business judgment rule. ¶¶56-60. These facts are sufficient at this stage of the litigation to support a claim for unjust enrichment. *See Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 394 (Del. Ch. 1999) (stating that once the facts alleged were sufficient to allege a breach of fiduciary duty, "it [was] axiomatic" that plaintiffs had also sufficiently pleaded a claim for unjust enrichment); *Weiss*, 948 A.2d at 443-44 (finding specific facts as to the alleged timing of option grants given to defendants unnecessary at the motion to dismiss stage).

Moreover, restitution is permitted regardless of whether the defendant retaining the benefit is a wrongdoer or had a role in approving the 2010 executive compensation. *Tupper*, 349 Or. at 221 ("[R]emedy [for unjust enrichment] is not limited to property that remains in the hands of the party who was directly involved in the wrongful divestment or retention."); *Ryan*, 918 A.2d at 361. *In Ryan*, as here, defendants challenged the validity of the plaintiffs' unjust enrichment claim arising from a stock option backdating executive compensation scheme at Maxim. In rejecting defendants' arguments, the *Ryan* court held:

> Even if [defendant] fails to exercise a single option during the course of this litigation, that fact would not justify dismissal of the unjust enrichment claim. Whether or not the options are exercised, the Court will be able to fashion a remedy. . . . Either way, [defendant's] alleged failure to exercise the options up to this point does not undermine a claim for unjust enrichment. Thus, I deny the motion to dismiss the unjust enrichment claim.

918 A.2d at 361.  Similarly, this Court should deny defendants' Motion on grounds for failure to plead a claim of unjust enrichment.

## IV.    CONCLUSION

Accordingly, defendants' Motion should be denied in its entirety.  Alternatively, plaintiffs should be granted leave to amend.  *Carvalho v. Equifax Info. Servs., LLC*, 615 F.3d 1217, 1232 (9th Cir. 2010) ("Under Federal Rule of Civil Procedure 15(a), leave to amend shall be freely given when justice so requires.").

DATED:  July 27, 2011                          Respectfully submitted,

                                               s/ TRAVIS E. DOWNS III
                                               TRAVIS E. DOWNS III
                                               BENNY C. GOODMAN III
                                               MATTHEW I. ALPERT
                                               ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
                                               655 West Broadway, Suite 1900
                                               San Diego, CA  92101
                                               Telephone:  619/231-1058
                                               619/231-7423 (fax)

                                               ROBERT J. MCGAUGHEY
                                               HOLLY E. PETTIT
                                               LAW OFFICE OF ROBERT J. MCGAUGHEY
                                               805 SW Broadway, Suite 2440
                                               Portland, Oregon 97205
                                               Telephone:  503/223-7555
                                               503/525-4833 (fax)
                                               Email:  office@law7555.com

                                               CAVANAGH & O'HARA
                                               PATRICK J. O'HARA
                                               407 East Adams Street
                                               Springfield, IL  62701
                                               Telephone:  217/544-1771
                                               217/544-9894 (fax)

                                               Attorneys for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 27, 2011.

s/ TRAVIS E. DOWNS III
TRAVIS E. DOWNS III

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  travisd@rgrdlaw.com

# Mailing Information for a Case 3:11-cv-00633-AC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew I. Alpert**
  MAlpert@rgrdlaw.com
- **Travis E. Downs , III**
  TravisD@rgrdlaw.com
- **Benny C. Goodman , III**
  BennyG@rgrdlaw.com
- **Thomas A. Larkin**
  tlarkin@lawssg.com,cschwend@lawssg.com
- **Robert J. McGaughey**
  bob@law7555.com,office@law7555.com
- **Jasand Mock**
  JMock@wlrk.com
- **Holly E. Pettit**
  holly@law7555.com,Office@law7555.com
- **Paul K. Rowe**
  PKRowe@wlrk.com
- **Thomas C. Sand**
  tom.sand@millernash.com,wendy.moore@millernash.com
- **John Spencer Stewart**
  jstewart@lawssg.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)