IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


PLUMBERS LOCAL NO. 137 PENSION                    Civ. No. 03:11-633-AC
FUND and LABORERS' LOCAL #231
PENSION FUND, derivatively on behalf of                    FINDINGS AND
UMPQUA HOLDINGS CORPORATION,                    RECOMMENDATION

                    Plaintiffs,

          v.

RAYMOND P. DAVIS, BRADLEY F.
COPELAND, RONALD L.
FARNSWORTH, MARK P. WARDLOW,
ALLYN C. FORD, PEGGY Y. FOWLER,
STEPHEN M. GAMBEE, JOSE R.
HERMOCILLO, WILLIAM A. LANSING,
LUIS F. MACHUCA, DIANE D. MILLER,
HILLIARD C. TERRY III, BRYAN L.
TIMM, FRANK R.J. WHITTAKER and
PRICEWATERHOUSE COOPERS LLP,


                    Defendants,


FINDINGS AND RECOMMENDATION          1                                  {KPR}

and

UMPQUA HOLDINGS CORPORATION,
an Oregon corporation,

                    Nominal Party.

_____

ACOSTA, Magistrate Judge:

*Introduction*

          This motion concerns the viability of a derivative suit brought by Plumbers Local No. 137

Pension Fund and Laborers' Local #231 Pension Fund ("Plaintiffs") on behalf of Umpqua Holdings

Corporation ("Umpqua").  The action names the members of Umpqua's board of directors and

executive officers as defendants ("Defendants"), and alleges that the board breached its fiduciary

duty of loyalty to Umpqua.  It also alleges that executive officers Raymond P. Davis ("Davis"),

Bradley F. Copeland, Ronald L. Farnsworth, and Mark P. Wardlow were unjustly enriched by the

board's disloyal action.  Defendants move to dismiss the action on the grounds that Plaintiffs failed

to satisfy the presuit demand requirement under the heightened pleading standard for derivative suits

and that Plaintiffs otherwise fail to state claims upon which relief may be granted.  The court holds

that Plaintiffs failed to meet their burden with respect to the presuit demand requirement and, for this

reason, Plaintiffs' claims should be dismissed.

*Factual Background*

          For purposes of this motion, the factual allegations in the complaint are taken as true.  The

parties submitted additional evidence, the contents of which are not disputed and are reproduced here

in summary as the court deems relevant.  Umpqua's compensation policies are set forth in the

Umpqua Holdings Corporate Proxy Statement ("the Proxy Statement").  A compensation committee

FINDINGS AND RECOMMENDATION          2                              {KPR}

is charged with setting executive compensation. (Proxy Statement 29.[1]) The Proxy Statement details

the actions taken by the compensation committee with respect to executive compensation. It states

that compensation for 2009 "reflected the effects of the recession and the significant impact of the

housing market downturn and increasing unemployment" on its business. (Proxy Statement 37.)

It goes on to detail what Umpqua accomplished in 2009, including raising revenue through a public

offering, increases in mortgage banking revenue, and new community, commercial, and international

banking operations. *Id*. The Proxy Statement notes that, having received "capital investment from

the U.S. Treasury in 2008" Umpqua accepted the compensation limitations attached to that

investment for 2009 and 2010. (Proxy Statement 38.) It explains that once the limitations were

lifted, sometime in 2010, the compensation committee made a considered decision to "normalize"

compensation of its executives. *Id*.

     In determining base salary for executive officers, the Proxy Statement states that it

commissioned an executive compensation study and a "benchmarking study" both of which provided

guidance regarding executive base salaries. (Proxy Statement 40.) With respect to incentive

compensation for executive officers, the Proxy Statement sets forth the "performance categories"

that executives were expected to focus on, including financial targets as measured by operating

earnings per share ("OEPS"); leadership; regulatory compliance; and the executives' particularized

goals. (Proxy Statement 41.) The Proxy Statement goes on to state that the executives met their

collective and independent goals and, as such, were rewarded with incentive pay. In general,

Umpqua's compensation policy rewards performance with compensation based on both financial and

---

    [1] The Proxy Statement is found in the Declaration of Steven G. Liday (#21) at Exhibit 1. Citations to the Proxy Statement refer to the pagination of the original document itself, and not the pagination of the exhibit.

non-financial metrics.  (Proxy Statement 30-31.)

  The 2010 executive compensation program increased the compensation for each executive officer by approximately 60 up to 160 percent.  (Complaint ¶¶ 11-14.)  Also in 2010, Umpqua's return to shareholders was a negative 7.7 percent.  (Complaint ¶ 15.)  The board unanimously approved the executive compensation package for 2010, and "[o]n February 25, 2011, the Umpqua Board unanimously recommended shareholder approval" of the 2010 executive compensation program.  (Complaint ¶ 38.)  The board of directors submitted its executive compensation program to shareholders for an advisory vote for the shareholders' approval, or lack thereof (the "say on pay vote").  This vote was mandated by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which provides that, at least once every three years, a shareholder vote be held to approve or disapprove executive compensation, though this vote is expressly non-binding on the board of directors, nor does it otherwise modify the powers and duties of the board of directors.  15 U.S.C. § 78n-1(a),(c) (2011).  With respect to the non-binding nature of this vote, the Proxy Statement states:  "We believe that our compensation policies and procedures are strongly aligned with the long-term interests of our shareholders.  Because your vote is advisory, it will not be binding upon the Board.  However, the Compensation Committee values your opinion and will take into account the outcome of the vote when considering future executive compensation arrangements." (Proxy Statement 8.)

  On April 22, 2011, Umpqua shareholders rejected the 2010 executive compensation program by approximately sixty-two to thirty-five percent (with three percent abstaining).  (Downs Decl. Ex A.)  Those voting against the proposed executive compensation package included thirteen of Umpqua's twenty largest shareholders.  (Downs Decl. Ex. D.)  A few months later, the board

notified Umpqua shareholders that, in light of the results of the say on pay vote, the board would

endeavor to "more closely link executive compensation to stock price and dividend performance."

(Downs Decl. Ex. B.)

*Standards*

A derivative action is a lawsuit brought by a shareholder on behalf of a corporation against

a third party, which may include executive officers and members of the board of directors.  Such a

suit may arise where the corporation declines to initiate a suit against a third party on its own behalf

and an individual shareholder opts to initiate a suit on the corporation's behalf.  The derivative suit

is subject to unique procedural prerequisites, including a heightened pleading standard for certain

factual allegations and a demand requirement which provides that, prior to initiating a civil suit, a

shareholder must seek redress from the board of directors ("the presuit demand"), or show that such

an effort would have been futile.

Federal Rule of Civil Procedure ("Federal Rule") 23.1 provides a heightened pleading

standard

> when one or more shareholders or members of a corporation or an unincorporated
> association bring a derivative action to enforce a right that the corporation or
> association may properly assert but has failed to enforce.  The derivative action may
> not be maintained if it appears that the plaintiff does not fairly and adequately
> represent the interests of shareholders or members who are similarly situated in
> enforcing the right of the corporation or association.

FED R. CIV. P. 21.3(a) (2011).  Section (b) sets forth pleading requirements, which include the need

to allege facts regarding the demand:  the complaint must "state with particularity: any effort by the

plaintiff to obtain the desired action from the directors or comparable authority and, if necessary,

from the shareholders or members; and the reasons for not obtaining the action or not making the

effort." FED. R. CIV. P. 23.1(b)(3) (2011).[2]

As such, "Federal Rule of Civil Procedure 23.1 permits a plaintiff to bring a shareholder derivative suit if two requirements are met. First, the plaintiff must have owned shares in the corporation at the time of the disputed transaction (the 'contemporary ownership requirement'). Second, the plaintiff must 'allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors' (the 'demand requirement')." *Potter v. Hughes*, 546 F.3d 1051, 1056 (9th Cir. 2008) (citing *Smith v. Sperling*, 354 U.S. 91, 96-97 (1957); FED. R. CIV. P. 23.1 (2008). The demand requirement protects the primacy of the board of directors in handling corporate affairs: "Because a derivative action, by its very nature, impinges on the managerial freedom of directors, [the demand requirement] operates as a threshold to insure that plaintiffs exhaust intracorporate remedies and protect against strike suits." *Postorivo v. AG Paintball Holdings, Inc.*, Civil Action Nos. 2991-VCP, 3111-VCP, 2008 WL 553205, at *4 (Del. Ch. 2008). Board members are typically "entitled to a *presumption* that they were faithful to their fiduciary duties. In the context of presuit demand, the burden is upon the plaintiff in a derivative action to overcome that presumption." *Beam v. Stewart*, 845 A.2d 1040, 1048-1049 (2004) (emphasis in original).

Under applicable law,[3] the shareholder must make a demand for action to the board of

---

[2] Defendants move to dismiss Plaintiffs' claims under both Federal Rules 23.1 and 12(b)(6). In light of the particularized pleading requirements of Rule 23.1, the court concludes that analysis under Federal Rule 23.1 is the appropriate vehicle to analyze pleading sufficiency.

[3] "Demand futility is determined under the law of the company's incorporating state–in this case, Oregon." *Sommers v. Lewis*, 2009 U.S. Dist. LEXIS 29776, at *8 (D. Or. Apr. 8, 2009). This area of law is "undeveloped" in Oregon, and courts often look to Delaware law for guidance. *Id*. In this case, the parties both rely on Oregon and Delaware law and the court will rely on it as well.

directors prior to initiating suit, and a suit is only permitted where the demand was either rejected or ignored. *See* OR. REV. STAT. 60.261(2) ("A complaint in a proceeding brought in the right of a corporation must allege with particularity the demand made, if any, to obtain action by the board of directors and either that the demand was refused or ignored or why a demand was not made."). If a demand was not made to the board, the plaintiff may still initiate an action where it is shown that such demand would have been futile. *See Potter*, 546 F.3d at 1056 ("However, failure to meet the demand requirement may be excused if the facts show that demand would have been futile."). In this case the parties agree that demand was not made as required by Oregon law prior to initiation of this action and Plaintiffs must, therefore, demonstrate that demand would have been futile.

Futility of demand must be pleaded where no demand is made. Futility can be shown in one of two ways: "If a plaintiff argues demand futility, the two-prong test under *Aronson* [*v. Lewis*, 473 A.2d 805 (Del. 1984)] and its progeny must be met. The first prong of the *Aronson* test is whether 'a shareholder [has pleaded] *with particularity* facts that establish that demand would be futile because the directors are not independent or disinterested.' The second prong of the test is whether 'a reasonable doubt is created that . . . the challenged transaction was otherwise the product of a valid exercise of business judgment.' The two prongs of the *Aronson* test are disjunctive, meaning that if either part is satisfied, demand is excused." *In re J.P. Morgan Chase & Co. Shareholder Litigation*, 906 A.2d 808, 820 (Del. 2005) (emphasis in original) (internal citations omitted).

The court will analyze the two prongs in turn.

*Discussion*

I.    The Futility Analysis

As a threshold matter, the court distinguishes between the standard employed in evaluating

demand futility and the standards underlying the derivative claims themselves.  The demand futility

analysis does not require that the court evaluate the board's compensation decision challenged here,

but merely whether the circumstances of that decision excuse Plaintiffs from meeting the presuit

demand requirement.  Thus, the court determines only whether the board's alleged interest in the

compensation decision would have precluded it, in response to a demand, from conducting an

objective and unbiased assessment of a shareholder challenge to the appropriateness of that decision.

The court expresses no opinion regarding the merits of the Plaintiffs' allegations or the Defendants'

defenses.

II.    <u>Disinterested and Independent</u>

The first prong of *Aronson* considers whether board members were sufficiently independent

or disinterested in reaching the challenged decision.  Demand is excused where the shareholder

shows that a majority of the board was motived by personal interest or controlled by another

interested board member.  Defendants argue that only one board member, Umpqua CEO Davis,

received compensation as a result of the approval, and that Plaintiffs have not adequately alleged that

he exercised control over other board members.  Accordingly, Defendants argue, Plaintiffs cannot

demonstrate that a majority of the board was personally interested or lacking independence with

respect to the challenged action.  Plaintiffs counter that, where directors would likely be subject to

liability for the challenged actions, they cannot be considered disinterested.  Furthermore, Plaintiffs

argue, a benefit by a single board member may excuse demand where, as here, that board member

is in a leadership position or otherwise wields significant influence.

"A director will be considered unable to act objectively with respect to a presuit demand if

he or she is interested in the outcome of the litigation or is otherwise not independent." *Beam*, 845

A.2d at 1049. This interest may arise where the director will derive a personal benefit or suffer a personal detriment from the board's action. *Id*. The proper focus of the inquiry is "whether the director's decision is based on the corporate merits of the subject before the board, rather than extraneous considerations or influences." *Id. See also In re J.P. Morgan*, 906 A.2d at 821 ("Disinterested 'means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.' 'Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.'") (citing *Aronson*, 473 A.2d at 812, 816). *See also Postorivo*, 2008 WL 553205, at *7 ("A plaintiff can establish that a specific director is interested by making allegations that, for example, the director will personally benefit from the challenged action or suffer as a result of the lawsuit. A plaintiff can establish that a specific director is not independent by alleging facts that suggest the director is dominated by a closer personal or familial relationship or that the director is beholden to an interested director. This is necessarily a detailed, fact-intensive, director-by-director analysis.")

>A.    *Disinterest*

Plaintiffs do not dispute that only one director stood to personally benefit from the challenged action and, thus, that a majority of the board was not interested by way of direct benefit such as to avoid the presuit demand requirement. Plaintiffs contend, however, that the interest required to excuse the demand required is present because the board members face a substantial likelihood of liability in this derivative action. The only case Plaintiffs cite to support this novel theory is *NECA-IBEW Pension Fund v. Cox*, No. 11-451, 2011, U.S. Dist. LEXIS 106161 (S.D. Ohio, Sept. 20, 2011)

("*Cincinnati Bell*"), where the court held just that. However, *Cincinnati Bell*'s holding was recently called into question in light of the court's apparent lack of subject matter jurisdiction and, as that court found particularly troubling, the plaintiff's failure to disclose contrary authority in response to the court's specific inquiry.[4]

Notwithstanding any continued life *Cincinnati Bell* might retain, the court declines to embrace Plaintiffs' argument because its logic is circular and thus unpersuasive. The implicit premise of Plaintiffs' argument is that the self-interest sufficient to trigger demand futility is present whenever board members face the possibility of a lawsuit filed against them in response to a decision or other board action.[5] Under Plaintiffs' reasoning, the fact that presuit demand is itself suggestive of impending liability is sufficient to create the type of self-interest that triggers the demand futility exception. This would permit every derivative action plaintiff to argue that demand is futile and need not be made because no board would be able to act objectively in evaluating a presuit demand. Such a result would effectively erase the demand requirement and negate its purpose. The demand rule is intended to give a board the opportunity to reevaluate and correct decisions that shareholders challenge as against the company's best interest, thereby avoiding a shareholder lawsuit.

B.    *Independence*

A director is considered lacking in independence where a director is "so 'beholden' to an

---

[4] Plaintiff's counsel in *Cincinnati Bell* is counsel for the Plaintiffs in this case.

[5] "Possibility" is the court's characterization. Plaintiffs use "significant likelihood" and "substantial likelihood" to quantify the risk necessary to trigger the demand futility exception. However, Plaintiffs offer no analysis of how this standard is met here, other than pointing to the compensation decision they challenge to suggest that it speaks for itself. (Plaintiffs' Memorandum 13, 18)

interested director . . . that his or her 'discretion would be sterilized." *Beam*, 845 A.2d at 1050.

Plaintiffs argue that the board was subject to the outsized influence of the only director with a

personal interest in the challenged action, Umpqua CEO Davis. However, Plaintiffs do not provide

particularized factual allegations that, taken as true, establish that directors were beholden to Davis.

In fact, Plaintiffs make no such allegation at all, let alone an allegation that a majority of the other

board members were so beholden to Davis that they were unable to exercise discretion in their

capacity as members of the board. Again, Plaintiffs' argument presumes rather than pleads an

element necessary to maintain their claim. Consequently, Plaintiffs cannot avoid the presuit demand

requirement on the ground that a majority of board members were lacking in independence or unduly

beholden to an interested board member.

Plaintiffs presuit demand requirement is not excused under the first *Aronson* prong.

III.    Business Judgment

"The business judgment rule is a 'presumption that in making a business decision the

directors of a corporation acted on an informed basis, in good faith and in the honest belief that the

action taken was in the best interests of the company.'" *Crandon*, at 31 (quoting *Aronson*, at 812).

In order to overcome the presumption afforded a board's business judgment, the plaintiff must

establish, generally, a reasonable doubt that the challenged action was the result of reasonable

business judgment. In observing this rule, a court "will not substitute its judgment for that of the

board if the latter's decision can be attributed to any rational business purpose." *Unocal Corp. v.*

*Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (internal quotation marks omitted). To

adequately demonstrate business judgment, "the 'plaintiffs must allege particularized facts that raise

doubt about whether the challenged transaction is entitled to the protection of the business judgment

rule.' Specifically, the 'plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision.'" *In re J.P. Morgan*, 906 A.2d at 824 (quoting *In re Walt Disney Co. Derivative Litigation*, 825 A.2d 275, 286 (Del. 2003) (internal citation omitted)).

Here, Defendants argue that executive compensation decisions are classically within the business judgment exception, citing *Brehm*, at 263: "It is the essence of business judgment for a board to determine if a particular individual warrant[s] large amounts of money, whether in the form of current salary or severance provisions." (internal citations omitted). According to Defendants, Umpqua's policy provided that compensation be based on OEPS, a measurement standard which differs from a standard based on shareholder return. Defendants contend that OEPS provides an alternative and rational basis for the compensation decision.

Defendants further observe that the existence of a compensation committee supports the notion that the board exercised reasonable business judgment in its determination of executive compensation. They point out that compensation may be based on long-term goals, rather than on contemporaneous performance. Defendants cite *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 799 (Del. 2004), which states in relevant part: "The complaint alleges that Parrella and Lebovics received excessive compensation due to the 'gross neglect' of the board. But that is an assertion that is unsupported by any pled facts regarding the nature of the supposed gross neglect. NCT has a compensation committee comprised of two directors . . . whose independence is not challenged in the complaint. And the fact that Parrella and Lebovics received substantial salaries during a period when NCT was performing poorly would not, without more, ordinarily

sustain a claim."[6]

Plaintiffs argue that the shareholder vote rejecting the compensation package is prima facie evidence that the board's action was not in the corporation or shareholders' best interests and that this vote shifts the presumption in Plaintiffs' favor and, as such, requires Defendants to prove that the board exercised rational business judgment in approving the compensation package. Defendants argue that the this vote is insufficient to rebut the business judgment rule or shift the presumption in plaintiffs' favor. Defendants also point out that Dodd-Frank explicitly provides that it does not create a distinct basis for liability, quoting 15 U.S.C. § 78n-1(c), which states that such votes "shall not be binding on the issuer or the board of directors of an issuer, and may not be construed . . . (1) as overruling a decision by such issuer or board of directors; (2) to create or imply any change to the fiduciary duties of such issuer or board of directors; [or] (3) to create or imply any additional fiduciary duties for such issuer or board of directors . . . ." 15 U.S.C. § 78n-1(c) (2010). Defendants argue that shareholder disagreement with a board's decision does not exempt the decision from the business judgment rule – that is what boards do and why we have them – so long as the board acts in good faith.

Plaintiffs counter that directors are not entitled to a presumption of business judgment where they act contrary to the interests of shareholders, citing *Crandon.* They contend that, in light of the poor performance of Umpqua and the shareholder's clear statement via the say on pay vote whereby the shareholders expressed their disapproval of the compensation package, it is impossible to justify the board's compensation vote. Plaintiffs contend this is corroborated by the board's subsequent

---

[6] The court concluded, however, that in light of "other troubling facts" in the complaint, the plaintiff could sustain a "non-exculpated breach of fiduciary duty claim." *Id*.

statement that, in the future, it would link performance and pay more closely ("pay for performance"), characterizing this as an admission against interest that the board's action was unreasonable. Finally, Plaintiffs argue that the board has a duty to communicate truthfully on material issues with its shareholders and the concealment or misrepresentation of material facts is not protected by the business judgment rule.

The court agrees that compensation determinations are typically within the business judgment of the board and concludes that the Plaintiffs' allegations regarding the board's compensation decision in this case are not sufficient to overcome the presumption that the board exercised business judgment. First, the board's actions do not directly defy or violate any Umpqua bylaw, any shareholder agreement, or any legally mandated disclosure or reporting requirement. Instead, Plaintiffs rely on a policy, pay for performance, that does not establish a binding standard for compensation and, notably, the board's statement regarding pay for performance was not made until after the compensation package had been approved.

Plaintiffs' essential position is that if a simple comparison reveals a level of compensation inconsistent with general corporate performance, the business judgment presumption is necessarily overcome, a position that is unsupported by the applicable standards. Furthermore, Plaintiffs' conclusory allegations are not sufficient to create a reasonable doubt that the board took this action honestly and in good faith or to show that it was adequately informed in making the decision, thus overcoming the presumption. Specific allegations, not conclusory statements, are required state the claim sufficient to overcome the presumption. *See, e.g.*, *Ryan v. Gifford,* 918 A.2d 341, 354 (Del. 2007) ("The board had no discretion to contravene the terms of the stock option plans. Altering the actual date of the grant so as to affect the exercise price contravenes the plan. Thus, knowing and

intentional violations of the stock option plans, according to the plaintiff cannot be an exercise[] of business judgment.").

Second, Plaintiffs' reliance on *Cincinnati Bell* is misplaced for two reasons. As already discussed, it is unlikely that the case remains viable legal authority. Further, the court relied upon Ohio law in reaching its decision, which is different from Delaware law, the body of law to which Oregon looks for guidance. To contrast the legal frameworks, Defendants cite *Teamster Local 237 v. McCarthy*, Civ. No. 2011-cv-197841 (Superior Court of Fulton County, Ga., September 16, 2011) ("*Beazer*"[7]), a decision that applies Delaware law in a situation similar to this case, reached the conclusion Defendants urge here. In *Beazer*, the court concluded that the pleading did not meet the standard for presuit demand with respect to the business judgment rule. The court wrote: "Given that Delaware law, which the Dodd-Frank Act explicitly declined to alter, places authority to set executive compensation with corporate directors, not shareholders, this Court will not conclude that an adverse say on pay vote *alone* suffices to rebut the presumption of business judgment protection applicable to directors' compensation decisions." *Id.* at 12.[8] *Cincinnati Bell* applied a legal framework different from that which controls the court's decision here. In contrast, *Beazer* hews directly to the law of Delaware, which Oregon follows, and its reasoning is clear and well-taken, particularly given that its facts parallel those present here.

Finally, the court rejects Plaintiffs' argument that they have pleaded facts sufficient to

---

[7] Beazer Homes USA, Inc., was the corporation involved in the derivative action.

[8] The court also concluded that a say on pay vote does not on its own give rise to a substantial likelihood of liability such that a board could not exercise its disinterested judgment in considering a presuit demand. *Id*. at 14.

overcome the business judgment presumption by alleging the board made a material misrepresentation regarding the pay for performance policy.  In specific instances the presumption may be overcome where  a board of directors, although acting within the letter of a stockholder-approved plan, engages in deceptive conduct or misrepresents the true nature of its actions.  *See Weiss v. Swanson*, 948 A.2d 433 (Del. 2008) (where the board granted options that, although within the letter of the law, were manipulated in a manner that deprived shareholders of value, the board was not entitled to the presumption of business judgment); *see in re Tyson Foods, Inc. Consolidated Shareholder Litigation*, 2007 WL 2351071 (Del. Ch. Aug. 15, 20007) (although there was no explicit prohibition on granting options in a particular manner, the board's use of such options to benefit executives was not in good faith and should have been disclosed to shareholders).

These cases differ materially, however, from the present case.  First, as discussed previously, Plaintiffs' allegation that the board violated the pay for performance policy is not sufficient to overcome the business judgment presumption.  Thus, Plaintiffs' allegation that the board made a material misrepresentation with respect to pay for performance is likewise insufficient.  Second, that the board's compensation decision does not square with Plaintiffs' interpretation of the pay for performance policy is not the equivalent of an allegation that the board intentionally misled shareholders that it would follow the policy when, instead, it had no intention of doing so.  Again, there must be particularized facts supporting reasonable doubt that the board acted in good faith or upon sufficient information.  Here, the complaint's allegations do not dispel the presumption that the board's compensation decision can be attributed to any rational business purpose.  For these reasons, the challenged action is protected by the business judgment rule for purposes of presuit demand analysis and Plaintiff fails to meet the second *Aronson* prong.  Accordingly, Plaintiffs have

failed to demonstrate that they should be ecused from the presuit demand requirements under either *Aronson* prong, and Plaintiffs' complaint should be dismissed for failure to adequately plead the futility of presuit demand.

*Conclusion*

For the reasons stated, Defendants' Motion to Dismiss (#20) should be granted, without prejudice.

*Scheduling Order*

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due January 25, 2012.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 11th day of January, 2012.


_____/s/ John V. Acosta_____
        JOHN V. ACOSTA
   United States Magistrate Judge